# Supreme Court of Florida

_____

No. SC13-716
_____

**JOHN WILLIAM CAMPBELL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 5, 2015]

PER CURIAM.

John William Campbell appeals from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and sentence of death.

## FACTS AND BACKGROUND

### The Crime Scene

On August 10, 2010, pursuant to a neighbor's inquiry, Citrus County Sheriff's Deputy Casey Phillips, along with several other deputies, responded to the home of John Henry Campbell in Inverness, Florida, to check on his well-

being. John Campbell, sometimes referred to as "Jack," lived in a mobile home with his son, the appellant in this case, John William Campbell. In order to perform the well-being check, the officers entered the residence where Deputy Ed Blair saw Jack Campbell's body, covered with something that looked like a blanket or comforter, lying in a chair. The television was on and no one else was in the residence.

The medical examiner for the District 5 Medical Examiner's Office in Leesburg, Dr. Kyle Shaw, visited the scene and viewed the victim slumped in a large chair, partially covered, and with his pockets turned inside out. On top of the covering was a framed photograph. Dr. Shaw later performed the autopsy on Jack Campbell and found a very large, irregular wound along the right side of his head, with slight abrasions along the margins of the wound. The wound was a chop-type wound from a sharp implement that also caused blunt injury. The main portion of the wound, which was created by more than one blow, was about 7.5 inches by 2 inches in size and extended deeply into the victim's brain, which had extensive laceration or tearing on the right side and in the front.

In addition, there was a laceration on Jack Campbell's forehead and his right eye, and the bones surrounding his right eye were fractured. His skull was also fractured below the large wound. Dr. Shaw opined that, to cause these injuries, the victim must have been hit a minimum of three times and that the cause of death

was multiple chop and blunt force head injuries. When asked how quickly death would have occurred, Dr. Shaw testified the wounds would have been rapidly, but not necessarily instantaneously, fatal. He explained the wounds were "very severe" and "potentially could cause instant death or near instant death," but could have taken "[a]nywhere from an instant or a few seconds to minutes or possibly even hours." There were no defensive wounds.

Crime scene specialist Sherri Leahy found a hatchet-type tool on the stove in the kitchen area of the home. Deputy Charles Beetow also saw the hatchet and described it as a wooden-handled tool with a head that bore a blunt end and an opposite bladed end. The victim's DNA was found on the metal portion of the hatchet. Blood spatter was found elsewhere at the scene along with an empty wallet.

### Defendant Campbell's Actions after the Murder

Former Citrus County Sheriff's Deputy David Gallant was involved in the investigation on August 11, 2010, and determined that the victim's Chase credit card had been used at various locations on the night of the murder. The credit card company records showed that the card was used seven times at a Walmart in Inverness on August 10, 2010, beginning at 9:06 p.m., then at 9:18 p.m., 9:19 p.m., 9:20 p.m., 9:21 p.m., 9:22 p.m., and 9:23 p.m. The amounts charged were from $1 to $128.41. Several of the amounts charged were consistent with gift cards with a

service charge added. The credit card was also later offered at a CVS store in Ocala several times, but was not honored, and at a Mobil gas station in Ocala where it was also not honored. The credit card company records showed that Chase received a telephone call from a telephone registered to an individual named Thomas Ford at 3:43 a.m. on August 11, 2010, inquiring about the card not working.

Ford, an acquaintance of Campbell, saw him on the night of August 10, 2010, or in the early morning hours of August 11 at a Kangaroo Mobil gas station in Ocala. When Ford asked Campbell to put some gas in his truck, the credit card Campbell tried to use did not work. Campbell borrowed Ford's cell phone and called the credit card company, which conversation was later recorded on a CD and provided to the Sheriff's Office. Ford testified he had listened to the recording and it accurately reflected Campbell's side of the telephone call that he overheard Campbell make to Chase. The recording was played for the jury and in it, Campbell was heard telling the company his card did not work. When asked for his security information, Campbell gave the company a birth date that was neither his own nor his father's.

While still at the gas station, Campbell asked Ford to take thirty-five $2 bills into a store to exchange them for larger denominations. Campbell left, and Ford went into the Kangaroo gas station where he obtained the larger denominations,

which he took to Campbell, who had gone to a house "down the road." This exchange in the store was documented in a video recording that was played for the jury and showed Ford getting out of his truck, exchanging the $2 bills, and conversing with the cashier. Marion County Sheriff's Lieutenant Brian Spivey later went to the Kangaroo Mobil gas station and retrieved the thirty-five $2 bills that had been put aside for collection by law enforcement. The bills were admitted into evidence.

Citrus County Sheriff's Detective Dan Keszthelyi also assisted in attempting to locate Campbell after the murder. He learned that Campbell had been texting on his cell phone with Campbell's former girlfriend Margaret Driggers. In the early morning hours of August 11, 2010, when the deputy came to her house looking for Campbell, she offered to text him. When Campbell texted her back she notified the officers, and Detective Gary Atchison later reviewed the text messages on her cell phone. She identified a transcript of her text messages with Campbell on August 11 from around 10:30 a.m. until the time he was apprehended later that day.[1]

---

1. Driggers said that once Campbell was arrested and in jail, he wrote her letters on October 25 and December 1, 2010, but she never wrote him back. In the October letter, Campbell apologized for all the pain he caused her and said he crashed his car during the high-speed chase which occurred because he wanted to die. In the December letter, Campbell told her he was truly sorry and that he was lonely and needed a friend. He also said that when he texted her the day after the

A transcript of the text messages showed that messages were sent and received between Driggers' and Campbell's cell phones. Beginning on August 10, 2010, at 10:57 a.m., Driggers texted Campbell asking what he was doing. Campbell texted Driggers and told her to tell the police that he would be dead as soon as he ran out of gas. Campbell demanded that Driggers tell him what she knew and wrote, "Last chance to save my life. If you tell me the truth, I will be alive tomorrow. And if not, I die today." He texted her that he was "on the run" and was going to die. Driggers then asked Campbell why he was saying he was going to kill himself, and "what the hell did you do this time?" Campbell then texted Driggers, "I killed my dad." He further explained, "With an ax."

When Driggers indicated she did not believe Campbell, he texted her to call the police or go by the house. At 12:07 p.m., he wrote, "I wish this was a joke but it is all true. I really thought my life would turn out diffant (sic)." Campbell told Driggers to "call the cops" and show them the texts. Then, after a short break, the texting recommenced and Campbell asked Driggers if she had called the police. When she asked what he wanted her to say, he repeated, "I wish this was a joke but it is all true. I really thought my life would turn out diffant (sic)." The texting transcript ended at 2:11 p.m.

---

murder, he wanted to turn himself in but things did not work out that way because the chase began.

Records showed that Campbell's cell phone was near a cell tower in Ocala around 6 a.m., and then later was in Tampa and Brandon near cell towers along Highway 19 north from near Tarpon Springs into the Homosassa area. Still attempting to find Campbell, Detective Keszthelyi first saw Campbell driving a red Ford station wagon by a CVS store in Brooksville, going northbound on Highway 19. Keszthelyi began following Campbell, and when Campbell was near Weeki Wachee High School, Campbell pulled his car off the highway. Keszthelyi pulled off behind him and activated his light and siren. When Campbell drove back onto the highway seconds later, a chase ensued in which the vehicles reached speeds of up to 120 miles per hour. Keszthelyi requested a marked police vehicle to take over the chase, which it did near the Citrus County line. The chase was heading to a location approximately seven miles from the CVS. At that location, Deputy Sam Ruby and several marked vehicles were waiting, ready to deploy stop sticks on the highway to deflate Campbell's tires when he drove over them. Travelling at approximately 100 miles per hour toward the stop sticks, where the marked units were visible, Campbell veered his car without zigzagging or braking and crashed into one of the marked units. Deputy Ruby was struck with debris and injured. Campbell, who was not wearing a seat belt, was also injured. Crime scene specialist Sherri Leahy processed the red Ford Escort vehicle that Campbell was

driving when he crashed and found the victim's checkbook, credit card, driver's license, and library card, and a one-dollar bill.

## Campbell's Statements to Law Enforcement

Citrus County Sheriff's Detective John Bergen was one of the officers who responded after Campbell crashed his vehicle into the marked patrol car during the high speed chase. Bergen rode in the helicopter with Campbell when he was taken to Bayfront Medical Center in St. Petersburg and stayed with Campbell while he was in the emergency department and trauma room. Detective Blair joined them at the hospital and accompanied Campbell into surgery. Bergen said that while in the trauma room, Campbell was able to respond to the questions asked by emergency personnel and appeared to be rational even though he was somewhat sedated. When Campbell was asked for a name of someone who should be called in case of an emergency, Campbell responded, "I killed him, I killed him."

Hernando County Sheriff's Detective Thomas Breedlove, who on August 12, 2010, was investigating Campbell's car crash near the Hernando/Citrus County line, accompanied Citrus County Detective Gary Atchison to the Bayfront Medical Center where they spoke to Campbell. After reading him his Miranda rights, Campbell waived his rights and spoke with them, which interview was recorded. In the recording, which was played for the jury and showed Campbell waiving his Miranda rights, Detective Atchison advised Campbell that they found

his father and had spoken to Margaret Driggers. When Atchison told Campbell they had seen a video of him at Lowe's, Campbell said he would not answer any questions about that.[2] When Campbell said he was in a lot of pain, Atchison asked if it was his knee, and Campbell said that was not what he was talking about, and when asked if he was mentally all right, Campbell said, "No, I want to fuckin' die" and "Until I die, I'm not going to be at peace with myself." Campbell told the officers that he would not stop trying to kill himself until he was dead, and that he was going to commit suicide. Campbell said he crashed the car intentionally and had taken off his seat belt before the crash. When asked if he wanted to die because of what he had done recently, he responded that it was because of his whole life. Campbell then started to cry.

When Atchison asked him again about his father, Campbell said he did not want to talk about that and he wanted a lawyer. He then said, "Unless y'all give me the death penalty, I don't want to talk." The detective responded that they were finished talking and turned off the tape. Detective Atchison testified that when the recorder was shut off, Campbell said he wanted to retract his request for a lawyer, and the detective again read Campbell his rights. At that point, Campbell told the

_____

2. The record shows that an affidavit was later filed for a search warrant on December 1, 2011, stating that Campbell was identified as robbing a Lowe's store on August 10, 2010, the same date as the murder, and that on August 11, 2010, a warrant was issued against Campbell for that offense.

detectives he would continue to talk about his father if he could get some pain medication for his knee. A nurse sought authority for pain medication but none was authorized at that time. When the detectives advised Campbell of this, he said, "What's the use," and demanded that they turn the recorder back on.

An audio recording was then made of the second statement Campbell made at the hospital. This statement was played for the jury and, in it, Campbell was read his Miranda rights again, which he waived, and said he did not want a lawyer. When asked if he had murdered his father, Campbell said, "Yes." When asked how, he responded, "It was a hammer hatchet." When asked how many times he hit his father, Campbell said "twice." When asked what happened prior to the murder, Campbell started crying and said, "Years. All this shit's been going on for years," and that "[h]e just never talked to me. I tried and any time I'd express my opinion . . . ." Campbell said his father would not talk, but would just sit, and was miserable and angry and bitter, and kept saying he wanted peace. Campbell said, "And I was like, You know what? I can give you peace, and that's when I - - I sit behind him and waited and I just hit him." Campbell told the detectives:

> JOHN CAMPBELL: (Crying) I was sitting - - yeah, I was sitting at the computer (moaning) and I hit him and he said - - he said, "What was that?" And I hit him again and that was it. He died. I covered him up and I put my sister's picture on him because that was who he loved. He didn't - - he didn't care about anybody else. He didn't care about me. He just wanted peace and I gave it to him. You know, my family wanted money, so now they got it. I don't want nothing. I want to die.

- 10 -

Campbell admitted to wiping off the hammer hatchet with a "scrubby pad" at the sink.

When asked if he had been at Lowe's and Walgreens earlier on the day of the murder, Campbell said, "Yes, I was just getting jacked up on crack" and "Uh-huh, that's what - - that's what the money was for."[3]  Campbell then related that after the murder he drove around, going to Silver Springs near Ocala, then to Hillsborough and Pinellas counties and back toward Citrus County.  Campbell again stated that the car crash was an attempt to kill himself and he was not trying to hurt the officer, "[s]o I don't want no attempted murder on no officer."

A third recorded formal statement was taken from Campbell at the Bayfront Medical Center on the morning of August 13, 2010, and it was played for the jury. Campbell was again read his Miranda rights, which he waived.  He related that before the murder, he had purchased groceries at Walmart and had gone to Lowe's. When he got home, he put the groceries away.  He could not say how long he was home before the murder, but at some point, he got the ax from a toolbox outside the house.  He waited a while before hitting his father and, during that time, was not arguing with him.  After the murder, Campbell opened his father's strongbox

---

3. After the sentencing in this case, Campbell entered a nolo contendere plea to a number of crimes, including robbing a Lowe's store on the same day as the murder.  The jury did not hear about these crimes.

but found nothing in it. However, he found a stack of $2 bills in his father's dresser. Campbell admitted he was looking for money and that he took his father's wallet and some credit cards. He left the house, he said, "to buy crack" and admitted to using his father's credit card at Walmart to purchase gift cards, cigarettes, gas, and some rugs. He explained that a friend in Ocala asked him "to get some rugs, so I bought some damn rugs" for the "crack house" and, after he did so at Walmart, he took the rugs there. He also took the gift cards and traded them for crack.

In this same recorded statement, Campbell said he bought some crack at the crack house, where he stayed for a couple of hours, but someone called to warn him that the police were looking for him so he left and drove around. After leaving the crack house, he drove back by his father's house, but saw a lot of police cars there so he "hauled butt." He subsequently found himself on I-275 in the Tampa area and planned to keep driving, and when he ran out of gas, he said, he "was gonna kill [himself] somehow." At some point, he was driving on Highway 19 and drove back to Citrus County, he said again, in order to kill himself.

This ended the playing of the third recorded statement. Detective Atchison explained that a short time later, before leaving the hospital and after Atchison and Campbell spoke off the record, Atchison asked if he could turn the recorder back on for a fourth statement. Detective Atchison again advised Campbell of his

<u>Miranda</u> rights. Campbell was asked about the point at which he pulled over while driving and was subsequently followed by one of the vehicles attempting to stop him. Campbell admitted that he took off when the officer turned on the police lights. Campbell said he was driving at least 110 miles per hour and that when he decided to ram a marked police car at that speed, he did not know if there was an officer inside or near the vehicle, but was just trying to kill himself. He said he did not brake, but just veered to hit the police car and closed his eyes.

Also in this fourth statement, Campbell agreed that he told Atchison off the record that he hit his father three times with the ax. He related that he was sitting behind his father, then got up and swung the ax from behind his father's recliner. He said that before he hit his father, he kept flipping the ax trying to decide whether to hit him with the sharp end or the flat end of the metal head of the ax. After the first blow, his father yelled, "What was that?" Campbell said, "[H]e might have even sit up, but I don't think so." Campbell agreed that when he hit his father the second time, he used both hands and "buried the hatchet" inside his father's head, feeling the skull give. Campbell said his father was knocked out, but was sort of snoring or gurgling. When he saw his father's hand reach up about five minutes later, Campbell hit him again. During that five-minute period, Campbell was pacing and looking for valuables in the house. He said he hit his father the

third time because he did not want him to suffer. Campbell reiterated that he tried to clean the hatchet with a "scrubby" and left the hatchet on the stove.

Detective Atchison left the hospital on August 13, 2010, but met with Campbell again when he was in the Citrus County jail on August 16, 2010, at Campbell's request. Atchison again advised Campbell of his <u>Miranda</u> rights. In this fifth statement, Campbell began by saying, "As far as the murder goes - - oh, God, it's hard for me to say, but, you know, I've wanted to put him to death for a few - - for a few days." Campbell said he had been "meditating" on it and did not know how, but knew he would do it eventually. He said it was "[f]or peace, mostly." Campbell said he and his father were both mentally suffering and Campbell finally "just snapped. . . . I just - - you know, and I guess I wanted to do it, you know?"

**The Penalty Phase**

In its penalty phase case, the State offered the trial testimony presented in the guilt phase and further presented a number of witnesses. Angela Thatcher, the sister of Campbell's estranged wife, testified that when she was living in Texas on May 4, 1998, she entered her apartment after work and found Campbell in her closet. He grabbed her by the hair and said, "They took something from me and I'm going to take something from them." He threw her on the bed and tried to hit her with a hammer. She grabbed the hammer and threw it across the room and

- 14 -

continued struggling with Campbell. He finally calmed down and said "I don't know why I'm doing this to you." She said he was angry with her family and missed his three-year-old son, whom he was not allowed to see unsupervised by his mother-in-law and wife. She testified that her sister did not want her son to be with Campbell unsupervised because she thought Campbell was unstable. After the incident, Campbell was hospitalized, presumably for mental issues. The State then presented a certified copy of Campbell's conviction and sentence in Texas in case number 98-CR-0838 for attempted burglary of a habitation with intent to commit an aggravated assault, pertaining to this incident.

Citrus County Sheriff's Deputy Sam Ruby again testified that when he was involved in the attempt to apprehend Campbell in August 2010, he was standing in front of his marked patrol car when Campbell's car, being pursued by other officers, turned and headed directly toward the marked patrol car. Ruby was transported to the hospital, but had no visible injuries and returned to work the next day. The State introduced into evidence the certified copies of the judgment and sentence entered in Hernando, Florida, on December 14, 2011, in case number 2010-CF-1820, for Campbell's attempted murder of a law enforcement officer.

Over defense counsel's general objection to victim impact testimony, Jill Lane read from her prepared statement that she had been friends with the victim, John Henry Campbell, since she was fifteen years old. She said the victim had

three sisters who are still alive and are devastated. The victim would visit her family and have holidays with them. She testified that the victim was a grandfather who loved his grandchildren, and whose deceased daughter left a little boy that would never see his grandfather. His death was a great loss to his family and his friends. After her testimony, the State rested its penalty phase case.

The defense presented its case for mitigation, beginning with Donnie Spears, who appeared by videoconference from Houston, Texas. He has known Campbell since elementary school and both lived in the same apartment complex in Pasadena, Texas. Spears testified that as children they did not go into Campbell's home very often when his father was there because the father was distant and did not want to be bothered. When Campbell's father was around, Campbell seemed depressed. In seventh grade, Campbell's girlfriend was murdered and Campbell was very affected by that and became distraught. Spears related that another friend, Alvin Parker, killed himself in his family's apartment, located right below Campbell's apartment, after breaking up with his girlfriend. After his friend's suicide, Campbell started taking drugs, mainly LSD. Spears had not had any contact with Campbell since about ninth grade.

Campbell's half-sister Donna Sheffield from Laurel, Mississippi, testified about the depression she and Campbell's mother both suffered. When Sheffield was diagnosed with depression, she realized her whole family suffered from it.

- 16 -

Sheffield's sister, Rhonda, was hit by a car and killed in 2007. Sheffield said her stepfather, the victim in this case, came into her life when she was 18 months old, and Campbell was born about six years later. Sheffield testified that their mother and the victim fought several times a week, mostly after drinking alcohol. She said that after the fights, the children would find everything "busted up and blood" from both of them, who were usually injured. She testified that her stepfather would usually leave the house for a couple of days, leaving their mother in charge, and when that happened, their mother would sometimes beat her, and once threw her out of the house. Once she was thrown out and had to sleep in the car because she had nowhere to go. Sheffield testified that as a child, she made an oak bat and planned to use it for protection. She once hit her stepfather with it when he put a cigarette out on her mother's forehead. Her stepfather was away a lot, often for weeks or months, leaving their heavy-drinking mother with the children. Her mother was mean and violent when she was drunk, and her stepfather was a hard worker but was distant. Sheffield said Campbell was shy and was placed in special education in school, but their parents never helped him. She said Campbell started using drugs at about age 13 or 14.

The next mitigation witness, Nicholas Smith, age 22, was residing in the Citrus County Detention Facility. He met Campbell in the facility and had recreation with him every day for a couple of months in 2012. Campbell gave him

several books about biblical scripture and listened to his problems, counseling him about his substance abuse. Campbell wrote him a letter and told him he was a good man and that change must come from within. Smith testified that Campbell was never violent, but did have a verbal altercation with another inmate.

Citrus County Detention Facility corrections officer Robert Taylor testified that he had been working in the segregation unit where Campbell was housed. In July 2008, Taylor became aware that Campbell was in the recreation yard with about 40 feet of cord he made from bed sheets. Campbell had thrown the cord over the wire and attempted to climb it. Taylor said throwing the cord over the wire would not have enabled him to escape. Other than this incident, Campbell generally followed the rules. However, on cross-examination, Taylor agreed that in May 2011, Campbell threatened to kill him and a disciplinary report was written on the incident, and that Campbell has had other disciplinary problems.

The defense next called Campbell's mother Kathy Hustead to testify via videoconference from Mississippi. She testified that Campbell was a slow learner and was in special education. She said that Campbell was in psychiatric hospitals when he was young and that he told her he had tried to commit suicide by taking an overdose of Tylenol. She testified that she and Campbell's father fought a lot, sometimes due to alcohol consumption. Hustead reported that she suffers from

depression and takes medication so that she is able to care for her deceased daughter's child.

Gretta Delong, formerly Gretta Barton, testified that Campbell was a good friend of her son Ted when they were young. As a child, Campbell was always polite and well behaved, charming, fun, and obedient. They lived in the same apartment complex, and Campbell and her son attended the same school, although Campbell was in special education. She also knew Campbell's parents. His mother would often call the house, sometimes angry and drunk, and was sometimes violent with Campbell and would beat him. Delong testified that Campbell's father would leave the children to fend for themselves and took no interest in taking care of the children, although he would provide money for the family. The parents drank alcohol on a daily basis and it accelerated on the weekend, and Campbell would often come to stay at her house, sometimes in the middle of the night. After Delong's family moved to Marshall, Texas, Campbell lived with her family for six months. Campbell stayed with them for several summers, and the last time he came, at age 16 or 17, he was unkempt and seemed depressed. Delong has not seen or heard from Campbell for about 12 years.

The defense presented Dr. Peter Bursten, a clinical psychologist with a practice in forensic psychological services, who met with and evaluated Campbell. Dr. Bursten testified that he met with Campbell three times at the Citrus County

jail and reviewed a psychological evaluation report from 1998, which was done

when Campbell was arrested at age 24 in Texas. Dr. Bursten also reviewed

medical records from North Central Medical Center from 2000, Harris County

Psychiatric Center in 2005, and other mental health records from when Campbell

was incarcerated. Dr. Bursten interviewed Campbell's half-sister Donna and the

family friend, Gretta Delong. Based on the medical records and interviews,

Dr. Bursten concluded that Campbell had an unstable and dysfunctional family

background, with alcoholic parents and an emotionally distant father. Campbell

witnessed violence between his parents and suffered sexual abuse by his brother,

which Campbell said he reported in 1998. Campbell was rejected and brushed

aside by his parents and had difficulty creating strong family bonds. Dr. Bursten

said Campbell experienced feelings of worthlessness, poor self-esteem, and

inadequacy. Campbell reported that he had been depressed since about age seven,

and all the mental health records showed that Campbell suffered from a major

depressive disorder. Campbell reported feeling suicidal, with a history of suicidal

gestures or symptoms and feelings of inadequacy, low energy, social withdrawal,

and sleep disturbance. Campbell also reported to Dr. Bursten that he had substance

dependency beginning at age 15.

Dr. Bursten noted that only several days before Campbell attempted to

attack his sister-in-law with a hammer, he had been released from the psychiatric

unit at Galveston Hospital where he had been diagnosed with major depressive disorder, which manifested itself to some degree with anger. Dr. Bursten said Campbell also met the definition of borderline personality disorder, a severe psychiatric diagnosis and the underpinning for major depression, anxiety, relationship instability, and mood swings. The disorder can result from experiencing rejection and feelings of abandonment when growing up, and individuals with this disorder often engage in self-injurious behavior including suicidal gestures, intensive drug use, risk taking, and sexual acting out. Dr. Bursten further opined that Campbell's relationship with his father left him feeling abandoned, because his father would reach out and then withdraw, leaving Campbell feeling rejected, worthless, and then angry. When Campbell was released from prison in Texas, he moved in with his father, who constantly "put him down." Dr. Bursten testified that Campbell's problems did not excuse or explain what he did to his father, and that when the murder occurred, Campbell knew right from wrong.

Dr. Bursten also diagnosed Campbell with antisocial personality disorder, which manifests in law breaking, impulsivity, and risky behavior. Dr. Bursten found that Campbell suffers from polysubstance dependence, and that he began to use hallucinogens about age 15 and experimented with ecstasy and cocaine for a

period of time. At about age 31, Campbell became heavily involved with methamphetamines, crack cocaine, and alcohol.

Dr. Bursten administered several tests to Campbell, including the Millon Clinical Multiaxial Personality Inventory, third edition. Campbell's test profile showed that he has many problems, including elevated anxiety, depression, drug dependence, post-traumatic stress, and major depression. Campbell also scored high in the area of bipolar disorder and mood instability. Dr. Bursten opined that Campbell's high level of substance abuse has been a form of self-medication against the turmoil of his life. He also opined that Campbell would do well in a supervised prison setting and would not exhibit the problems that he had in the community.

Finally, the defense replayed a portion of Detective Atchison's interview of Campbell in which Campbell said he was in emotional pain and in which Campbell said that he wanted to die and would not stop trying to kill himself. After closing arguments, the jury deliberated and returned an advisory verdict, voting eight to four to recommend death.

**Spencer Hearing**

The <u>Spencer</u>[4] hearing was held on February 7, 2013, at which Campbell gave a statement expressing thanks to the State and the court for seeking justice for his father, and apologizing for all the pain he had caused. Campbell said he had a tragic childhood and tried to clean up his life by getting married and becoming a father at the age of 18, but that did not work out. He said that ever since losing custody of his son in the divorce, he had wanted to die and attempted suicide twice. Campbell said when he was sent to prison the first time, he started bettering himself in the structured environment, and when he got out he got married again and tried to reconnect with his son, but that did not work out. He went back to prison for his second felony and, when he got out in 2004, he found that his sister had been killed in an accident. He said he was given the equivalent of a "Baker Act" proceeding in Texas and later moved to Florida. Campbell said what he did to his father was horrible and that he will suffer the consequences for the rest of his life. He pointed out that he tried to cooperate after his arrest in this case by giving statements to the police. While in prison on this charge, he tried to commit suicide again, but has since been trying to better himself. He asked the court to consider

---

4. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

sentencing him to life.  He said he has tried to do the right thing, although he did not always succeed.

## Sentencing Order

### Aggravating Circumstances

After consideration of sentencing memoranda submitted by both parties, the court, on March 19, 2013, held a sentencing hearing and entered the order sentencing Campbell to death.  The court found as an aggravating factor under section 921.141(5)(b), Florida Statutes (2013), that the defendant was previously convicted of felonies involving the use or threat of violence, including conviction for attacking his sister-in-law and attempting to hit her on the head with a hammer in 1998 after breaking into her apartment.  Prior to sentencing he was also convicted of attempted first-degree murder of a law enforcement officer and aggravated assault on a law enforcement officer with a deadly weapon during this instant crime because Campbell rammed the officer's vehicle at high speed with the car he was driving.  This aggravator was given great weight.

The court also found as an aggravating circumstance under section 921.141(5)(f), Florida Statutes (2013), that the murder was committed for pecuniary gain because Campbell took money, credit cards, and other things of value from the victim to use in purchasing illegal drugs.  This aggravator was given great weight.

The third aggravator found by the trial court, under section 921.141(5)(h), Florida Statutes (2013), was that the murder was especially heinous, atrocious, or cruel. The trial court found the evidence established that Campbell hit the victim three times with a hatchet and, based on Campbell's own statements, after the first blow the victim woke and asked, "What was that?" Campbell hit the victim a second time and proceeded to gather money and other items. His own statements indicated that after seeing the victim's arm move, Campbell struck him again with the hatchet. This aggravator was given great weight.

The fourth aggravator found by the court, under section 921.141(5)(i), Florida Statutes (2013), was that the murder was committed in a cold, calculated, and premeditated manner without pretense of moral or legal justification. The court based this aggravator on Campbell's statements to law enforcement in which he admitted to thinking for a couple of days about killing his father to bring him peace. The court noted that the evidence also showed that on the night of the murder, Campbell waited with a hatchet in his hand for the right moment to strike, showing reflection and goal-oriented activity. The court rejected Campbell's testimony that he committed the murder in a fit of rage because he was depressed. This aggravator was given great weight.

The trial court rejected two aggravators that were argued to the jury and upon which the jury was instructed. The trial court found that the State failed to

- 25 -

prove that the murder was committed to avoid arrest, under section 921.141(5)(e), Florida Statutes (2013), and that the victim was particularly vulnerable due to age or disability under section 921.141(5)(m), Florida Statutes (2013).

Mitigating Circumstances

The trial court found the statutory mitigator under section 921.141(6)(b), Florida Statutes (2013), that the murder was committed while Campbell was under the influence of extreme mental or emotional disturbance. This mitigator was based on the testimony of Dr. Bursten that Campbell had been diagnosed with depression, antisocial disorder, and borderline personality disorder; that he was previously hospitalized for attempted suicide; and that he was under the stress of job loss and a dysfunctional relationship with his father. This mitigator was given little weight.

The court also found the statutory mitigator under section 921.141(6)(f), Florida Statutes (2013), that Campbell's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. This mitigator was based on the testimony of Dr. Bursten that Campbell had a history of depression and drug abuse, other mental issues, and suicidal tendencies. The court concluded that even though Campbell knew right from wrong, the mitigator was established, but given extremely little weight.

- 26 -

Under section 921.141(6)(h), Florida Statutes (2013), providing for what is commonly called "nonstatutory mitigation," the trial court found several mitigators were proven. The court found Campbell had a family history of depression, a difficult childhood in which he was often neglected and subjected to physical abuse, and a difficult relationship with his own son. This mitigator was given very slight weight. The court also found Campbell's history of drug abuse, including LSD and crack cocaine, which led to his job loss, to be mitigating but entitled to only very slight weight. The court found Campbell's depression to be mitigating, in addition to its being a factor in the statutory mitigator discussed above, but that it was countered by evidence detracting from its mitigating aspects, and accorded it only very slight weight. Finally, the court found Campbell's remorse for the crime, shown by his lack of argument of innocence at trial and his suicide attempt after the murder, to be mitigating. However, the court characterized his remorse as "vaporous" and gave it extremely little weight as a mitigator.

Finally, the trial court found each of the aggravators "far outweigh" the mitigators and, after giving great weight to the eight-to-four recommendation of the jury, sentenced Campbell to death. This appeal ensued.

On appeal, Campbell raises five claims pertaining to the penalty phase of trial. Although he does not raise any claim concerning the sufficiency of the evidence to support the conviction for first-degree murder, we are required to

address that claim as well.  See, e.g., Jones v. State, 963 So. 2d 180, 184 (Fla. 2007).  We turn first to a discussion of Campbell's claim that the trial court erred in finding that the murder was committed in a cold, calculated, and premeditated manner.

## ANALYSIS

### Penalty Phase Claims

### A.  Whether the Evidence Supported the Finding that the Murder was Committed in a Cold, Calculated and Premeditated Manner

Campbell contends that the cold, calculated, and premeditated (CCP) aggravator is not supported by the evidence, primarily because the trial court also found that he committed the murder while under the influence of extreme mental or emotional disturbance, and while his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  Campbell also contends that the State failed to prove that he acted with cool, calm reflection and a careful plan when he murdered his father; and that the evidence did not show heightened premeditation that involved a sufficient period of time to plan or reflect on the murder.

The State, and the trial court in its sentencing order, relied on Campbell's statements to detectives in which he admitted he had been thinking about killing his father for a couple of days, and that on the day of the murder, Campbell retrieved the hatchet from the carport area and sat behind his father with it,

pondering the right moment to strike. The statements showed Campbell thought carefully during that time about which end of the hatchet head to use—the sharp end or the blunt end—before he struck his father. Campbell's own statements also showed that approximately five minutes after the second blow his father lifted his hand, at which time Campbell struck the third blow.

In order for a finding of CCP to be upheld, the following four factors must exist:

> (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

Lynch v. State, 841 So. 2d 362, 371 (Fla. 2003). When reviewing claims alleging error in the finding of aggravating factors, this Court does not reweigh the evidence. Franklin v. State, 965 So. 2d 79, 98 (Fla. 2007). Rather, this Court's role is to review the record to determine whether the trial court applied the correct rule of law for each aggravator and, if so, whether competent, substantial evidence exists to support its findings. Id. A court must consider the totality of the circumstances when determining whether a murder was committed in a cold, calculated, and premeditated manner. Gill v. State, 14 So. 3d 946, 962 (Fla. 2009) (citing Hudson v. State, 992 So. 2d 96, 116 (Fla. 2008)). The facts supporting CCP

must focus on the manner in which the crime was carried out, such as advance procurement of weapon, lack of provocation, and that the killing was carried out as a matter of course. Lynch, 841 So. 2d at 372. The focus of the CCP aggravating circumstance centers on the manner in which the defendant executed the crime. Walker v. State, 957 So. 2d 560, 581 (Fla. 2007); Looney v. State, 803 So. 2d 656, 678 (Fla. 2001). Legally sufficient evidence exists to support a trial court's finding of CCP where the defendant procures a weapon in advance, receives no provocation or resistance on the part of the victim, and carries out the killing as a matter of course. Looney, 803 So. 2d at 678; Farina v. State, 801 So. 2d 44, 54 (Fla. 2001). We find these circumstances present in the instant case.

The "cold" element is met where the defendant had " 'ample opportunity to calmly reflect upon [his] actions, following which [he] decided to shoot the victims execution-style in the backs of their heads.' " Walker, 957 So. 2d at 581 (quoting Looney, 803 So. 2d at 678). The "cold" element is shown in killings where the defendant receives no provocation or resistance from the victim but decides coldly and calmly to carry out the murder as Campbell did in this case.

In McGirth v. State, 48 So. 3d 777 (Fla. 2010), this Court found the murder "cold" for purposes of CCP based on evidence that the defendant shot the victim once, which was not fatal, and then proceeded to gather the victim's property. Instead of leaving with the stolen goods, the defendant returned and shot the victim

again in the head.  Id. at 793-94.  We reiterated in McGirth that the "cold" element is legally sufficient where the defendant had ample opportunity to calmly reflect on his actions, following which he decides to murder the victim.  Id. at 794 (citing Lynch, 841 So. 2d at 372).  In this case, Campbell's own statements show he pondered the murder in advance and, after retrieving the weapon, had ample opportunity to reflect on his actions and give up the plan to kill his father, but went ahead and killed him with multiple chops to his head despite the lack of any provocation or resistance.  Even after the first and second blows, Campbell had around five minutes in which he could have changed his mind about the murder and either left or called for medical help for his father, but instead he hit his father a third time, similar to what occurred in McGirth where CCP was upheld.

The "cold" element has been found lacking only in "heated" murders of passion "in which the loss of emotional control is evident from the facts." Altersberger v. State, 103 So. 3d 122, 127 (Fla. 2012) (quoting Looney, 803 So. 2d at 678 (quoting Walls v. State, 641 So. 2d 381, 387-88 (Fla. 1994))).  The evidence in this case did not show that Campbell killed his father in the heat of passion or with loss of emotional control.  Although there was evidence that Campbell was emotionally upset that his father was so distant, and Campbell himself was depressed, there was no evidence that this murder was impulsive, spur of the moment, or done in a rage or loss of control.

- 31 -

The evidence also established that the murder was "calculated." Campbell thought about the murder for several days, armed himself in advance, and while holding the weapon as his father sat in the recliner, thought for some time about just how to strike the blows. Then, Campbell killed his father in a calculated manner. When he saw that the first blow did not kill his father, he immediately struck a second time. He then searched the home for money and credit cards with which to buy drugs. Upon seeing his father move his hand, he calculated that to finish the job, he must strike his father a third time, which he did. This Court has found that the "calculated" element of CCP is supported by competent, substantial evidence where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill. McGirth, 48 So. 3d at 794.

The evidence also supports the element of "heightened premeditation." Evidence proving heightened premeditation can sometimes overlap with evidence proving the prearranged plan necessary to establish CCP. In this case, heightened premeditation was shown by Campbell's own statements that he thought about the murder for several days, and that on the day of the murder, he obtained the weapon in advance and thought for some time about the best way to accomplish the murder. Heightened premeditation is also shown by evidence that the defendant had the opportunity to leave the crime scene and not commit the murder, but instead committed it. Altersberger, 103 So. 3d at 127-28 (citing Alston v. State,

723 So. 2d 148, 162 (Fla. 1998)). The evidence showed that Campbell could have left the crime scene after retrieving the hatchet and before striking the first blow. He could have left the scene after the first blow, which was not immediately fatal, or after the second blow, but did not do so. Instead, he gathered items to use to obtain money for drugs. Only after that did he strike the last blow while the victim was still alive. These actions exhibited Campbell's heightened premeditation both before and during the incident.

Lastly, "[a] pretense of legal or moral justification is 'any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.' " Nelson v. State, 748 So. 2d 237, 245 (Fla. 1999) (quoting Walls, 641 So. 2d at 388). The evidence in the present case showed no pretense of legal or moral justification for the killing, and Campbell does not argue that the murder was justified.

Because competent, substantial evidence supported the trial court's finding of the CCP aggravator in this case, relief is denied on this claim.

## B. Whether the Evidence Supported the Finding that the Murder was Motivated by Financial Gain

The trial court found in the sentencing order that the evidence proved the murder was committed for pecuniary gain, and gave that aggravator great weight. The evidence established that in the midst of the murder, Campbell searched the house for money and credit cards. He admitted to opening his father's "strongbox" but finding it empty. He searched the dying victim's pockets—he said for car keys. He took thirty-five $2 bills. He used his father's stolen credit card to buy gift cards and other items which he traded for cocaine. He attempted to use the stolen credit card to buy gas. Campbell admitted that he had relapsed into drug use before the murder, and had lost his job. The trial court found that Campbell's testimony that he did not plan the murder for pecuniary gain and that the theft was an afterthought was not credible. We agree.

In order to prove pecuniary gain as an aggravator, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain. See Williams v. State, 37 So. 3d 187, 201 (Fla. 2010). The aggravator is applicable even if pecuniary gain was not the primary motive. See Orme v. State, 25 So. 3d 536, 550 (Fla. 2009) (finding primary motive for beating, rape, and murder was anger at victim for flushing defendant's cocaine down the toilet, but subsequent theft of victim's car

and valuables in order to ride around and obtain more drugs supported pecuniary gain aggravator).

Even if pecuniary gain was not the primary motivation in this murder, the record is clear that Campbell immediately searched the home for money and items of value that he could use to buy drugs or to buy items he could trade for drugs. He searched the victim's pockets, his "strongbox," and dresser. Campbell took credit cards and cash. There was competent, substantial evidence that the murder was motivated in part by a desire to take his father's money and property to use in obtaining drugs. Thus, the trial court did not err in finding this aggravator and assigning it great weight. Relief is therefore denied on this claim.

**C. Whether the Murder was Especially Heinous, Atrocious, or Cruel**

Campbell next contends that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel. For the reasons that follow, we agree. To find that a murder is especially heinous, atrocious, or cruel (HAC), the murder must be "accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim." Hernandez v. State, 4 So. 3d 642, 668-69 (Fla. 2009) (quoting State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973)). HAC focuses on

the means and manner of death and the immediate circumstances surrounding the death. Hernandez, 4 So. 3d at 669.

Campbell contends that in finding that his father's murder was especially heinous, atrocious, or cruel, the trial court only speculated that the victim "must have suffered great emotional strain, fear and terror when he awoke after the first blow." He argues that the trial court ignored the medical examiner's testimony that there were no defensive wounds, and that the immediate second blow on the right side of the victim's head was severe and extended deeply into the victim's brain, and was "rapidly fatal." In response, the State points to evidence that the victim was bludgeoned in the head with a rusty, dull ax at least three times, and that the victim was conscious and aware of his impending death after the first blow, as evidenced by his crying out, "What was that?"

The trial court and the parties all agree that Campbell's father was asleep when he was first struck on the head. It is also undisputed that he awoke briefly and asked, "What was that?" prompting Campbell to strike him again with the hatchet. Campbell agreed in his statement that when he hit his father the second time, he used both hands and "buried the hatchet" inside his father's head and felt the skull give. Campbell said his father was knocked out but was "sort of snoring or gurgling," but when he saw his father's hand reach up about five minutes later, Campbell hit him for the third time.

When the medical examiner was asked on cross-examination how quickly death would have occurred, Dr. Shaw's testimony was ambiguous as to how long the victim would have lived after the blows and whether he would have been conscious. He testified that the wounds would have been rapidly fatal and death potentially instantaneous, but "not instantly fatal." He explained that the head wound was a "very severe wound that potentially could cause instant death or near instant death, but probably a little bit longer. Anywhere from instant or a few seconds to minutes or possibly even hours." He said that if death took longer than a few minutes, it would be unlikely that the victim would remain conscious—and would probably be rendered immediately unconscious. It is also undisputed that there were no defensive wounds. When asked about the significance of the victim lifting his hand about five minutes after the second blow, Dr. Shaw said that such movements can be involuntary muscle movements and do not necessarily mean the person is conscious.

In Zakrzewski v. State, 717 So. 2d 488 (Fla. 1998), the Court found that the State failed to carry its burden of proof of HAC beyond a reasonable doubt where medical testimony indicated the victim "may have been rendered unconscious upon receiving the first blow from the crowbar, and as a result, she was unaware of her impending death." Id. at 493. In Williams, the Court struck the HAC aggravator because, although the victim was struck five times on the head with a

bat, "[t]he medical examiner was unable to testify without speculating about whether [the victim] remained conscious after the first blow with the bat and further stated that any of the blows could have caused unconsciousness and death." 37 So. 3d at 193. We emphasized that to uphold HAC, the evidence must show that the victim was conscious and aware of his impending death. Id. at 199.

The State cites Buzia v. State, 926 So. 2d 1203 (Fla. 2006), which held that HAC can be upheld in a beating death where the victim is awake and aware during at least part of the ordeal, and noting that the Court had upheld HAC where the victim was aware for "merely seconds." Id. at 1214 (citing Rolling v. State, 695 So. 2d 278, 296 (Fla. 1997)). However, in Buzia, the evidence showed the victims were knocked to the floor and both attempted to rise during the attacks. This alone proved that the victims were aware and conscious of possible impending death. And in Rolling, the evidence showed that the victim had defensive wounds incurred during the multiple stabbing attack, which the Court found was evidence that the victim was "awake and aware of what was occurring," and that the victim was trying to fend off the attack. 695 So. 2d at 296.

As noted, an important factor in determining if the victim was conscious and aware of impending death has been the presence of defensive wounds. For instance, in Dennis v. State, 817 So. 2d 741, 766 (Fla. 2002), we upheld HAC where both victims suffered skull fractures and were conscious for at least part of

the attack as evidenced by defensive wounds to their hands and forearms. In Wilson v. State, 493 So. 2d 1019, 1023 (Fla. 1986), HAC was found where the victim was brutally beaten while attempting to fend off the blows before being fatally shot. More recently, in King v. State, 130 So. 3d 676 (Fla. 2013), we found HAC proven where the victim died from head trauma after being struck approximately seventeen times with the head and claw of a hammer. She suffered injuries to the back of her head, neck, upper back, right hand, right leg, and left knee. Id. at 685. The wounds on her right hand and arm were characterized as defensive wounds. Id. The trial court found in King that the defensive wounds indicated that the blows to her head, which proved fatal, were not the first blows struck. Id.

As the State points out, this Court has held that the absence of defensive wounds alone does not preclude proof of HAC. See Zommer v. State, 31 So. 3d 733, 747 (Fla. 2010). But, the evidence in Zommer was clear that the victim fought back, id. at 738-39, and in the cases cited in Zommer, there was evidence that each of the victims had at least one defensive wound. Id. at 747.

In this case, the victim was asleep when he was first struck. Although he stated, "What was that?" this comment alone does not indicate he was aware of his impending death. There were no defensive wounds on the victim, and the medical examiner could not say with certainty if the victim was conscious after the

immediate second blow, which Campbell described as a blow delivered with a great deal of force. The medical examiner also testified that when the victim raised his hand approximately five minutes later, that movement could have been involuntary.

It was the State's burden to prove beyond a reasonable doubt that the murder was especially heinous, atrocious, or cruel. The evidence presented by the State did not reach this level of proof, based on the ambiguous and uncertain testimony of the medical examiner and the totality of the circumstances surrounding this murder. For this reason, the HAC aggravating circumstance is hereby stricken.

However, the evidence clearly supported the prior violent felony conviction aggravator, which we have held "is considered one of the weightiest aggravators." Silvia v. State, 60 So. 3d 959, 974 (Fla. 2011). The evidence also supported the cold, calculated, and premeditated aggravator, which we have also held is "one of the most serious aggravators." Id. Finally, the evidence supported the pecuniary gain aggravator. Thus, we find the error harmless beyond a reasonable doubt in this case. We find no reasonable possibility that Campbell would have received a different sentence. See State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986).

### D. Whether Florida's Sentencing Scheme is Unconstitutional under Ring v. Arizona

Campbell next contends that under the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), the jury was required to specifically and expressly

find the aggravators upon which they recommended a sentence of death. He also asks this Court to recede from its precedent in <u>Bottoson v. Moore</u>, 833 So. 2d 693 (Fla. 2002), and <u>King v. Moore</u>, 831 So. 2d 143 (Fla. 2002), in which the court upheld Florida's sentencing scheme.

The Supreme Court in <u>Ring</u> applied its holding in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), that other than the fact of a prior conviction, defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment, to capital cases. <u>Ring</u>, 536 U.S. at 589. "<u>Ring</u> did not alter the express exemption in <u>Apprendi</u> . . . that prior convictions are exempt from the Sixth Amendment requirements announced in the cases." <u>Frances v. State</u>, 970 So. 2d 806, 822 (Fla. 2007) (citation omitted). We have consistently held that <u>Ring</u>'s requirement of a jury finding does not apply in cases in which one of the aggravators supporting the death sentence is a prior violent felony conviction. <u>See, e.g.</u>, <u>Poole v. State</u>, 151 So. 3d 402, 419 (Fla. 2014); <u>Martin v. State</u>, 107 So. 3d 281, 322 (Fla. 2012), <u>cert. denied</u>, 133 S. Ct. 2832 (2013); <u>Johnson v. State</u>, 104 So. 3d 1010, 1028 (Fla. 2012); <u>Hodges v. State</u>, 55 So. 3d 515, 540 (Fla. 2010).

Accordingly, we reject Campbell's claim. <u>Ring</u> does not apply in this case because Campbell was found to have prior felony convictions involving the use or threat of violence. The State presented evidence, and the trial court found as

aggravating, the fact that Campbell was convicted of attempted burglary of a habitation with intent to commit aggravated assault; and in a separate case, attempted felony murder of a law enforcement officer with a deadly weapon, and aggravated assault on the law enforcement officer. Because the aggravators in this case included several prior violent felony convictions, Ring does not apply under the circumstances presented here. Relief is thus denied on this claim.

## E. Whether the Death Sentence is Proportionate

Campbell contends that the death sentence is not proportionate for this murder. Campbell's expert, Dr. Bursten, opined that at the time of the murder Campbell was emotionally disturbed and had suffered from major depressive disorder since childhood. Dr. Bursten testified that Campbell had an unstable and dysfunctional family background, with alcoholic parents and an emotionally distant father. He witnessed violence between his parents. Campbell was rejected and brushed aside by his parents and had difficulty creating strong family bonds. He had feelings of worthlessness, poor self-esteem, and inadequacy. Dr. Bursten also found that Campbell had a history of suicidal gestures or symptoms and feelings of inadequacy, low energy, social withdrawal, and sleep disturbance. Campbell's polysubstance abuse was supported in the record. Dr. Bursten also diagnosed Campbell with antisocial personality disorder, which manifests in law breaking, impulsivity, and risky behavior.

Based on this evidence, the trial court did find two statutory mitigators—that the capital felony was committed while Campbell was under the influence of extreme mental or emotional disturbance, and that Campbell's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired—but gave these mitigators only little weight. The court also found nonstatutory mitigation based on Campbell's family history, his history of depression, his history of drug use, and his expressions of remorse, but this mitigation was also given only slight or very slight weight.

In sentencing Campbell, the trial court weighed this mitigation against the aggravators established by the evidence—CCP, prior violent felony convictions, and a pecuniary gain aggravator, and concluded that the aggravating circumstances "far outweigh" the mitigating circumstances. In performing the proportionality review, this Court has explained:

> "[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails "a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." In other words, proportionality review "is not a comparison between the number of aggravating and mitigating circumstances."

Williams, 37 So. 3d at 205 (quoting Offord v. State, 959 So. 2d 187, 191 (Fla. 2007)).  However, in reviewing proportionality, we "will not disturb the sentencing judge's determination as to 'the relative weight to give to each established mitigator' where that ruling is 'supported by competent substantial evidence in the record.' "  Blackwood v. State, 777 So. 2d 399, 412-13 (Fla. 2000) (quoting Spencer v. State, 691 So. 2d 1062, 1064 (Fla. 1996)).  Further, we will "affirm the weight given an aggravator if based on competent substantial evidence."  Blake v. State, 972 So. 2d 839, 846 (Fla. 2007).  "The weight to be given aggravating factors is within the discretion of the trial court, and it is subject to the abuse of discretion standard."  Buzia, 926 So. 2d at 1216.

This Court has found the death sentence proportionate in cases involving substantial mental health mitigation and other mitigation where there is a weighty aggravator such as CCP, and the trial court gave full consideration and careful weighing to the aggravators and mitigators.  For instance, in McCoy v. State, 132 So. 3d 756 (Fla. 2013), we found the death sentence proportional where the court found two aggravating circumstances—CCP and prior violent felony—and mitigation that included the statutory mitigators that the defendant was under the influence of extreme mental or emotional disturbance and had no significant criminal history.  Expert mitigation testimony was given in McCoy's penalty phase

- 44 -

that he had a history of clinical depression and other psychotic features. We found

the death sentence in McCoy proportionate, stating:

> [A] review of other cases establishes that death is a proportionate
> punishment in this case. For example, in Lawrence v. State, 846 So.
> 2d 440, 455 (Fla. 2003), this Court upheld a death sentence despite the
> presence of five statutory mitigating circumstances, including
> considerable weight assigned to two statutory mental health
> mitigators. Further, Lawrence included the same two aggravating
> circumstances as this case—CCP and prior violent felony—both of
> which the trial court in Lawrence, like the trial court in this case,
> assigned great weight. Id.; see also Diaz v. State, 860 So. 2d 960, 964
> n.3 & n.4 (Fla. 2003) (upholding death sentence in case where the
> same two aggravators (CCP and prior violent felony), both assigned
> great weight, were upheld on appeal, and the trial court found five
> statutory mitigating circumstances, including the same two statutory
> mitigating circumstances as in this case (no significant history of prior
> criminal activity and under the influence of extreme mental or
> emotional disturbance), as well as the age mitigator and the additional
> mental health mitigator rejected by the trial court in this case).

McCoy, 132 So. 3d at 774-75.

In Beasley v. State, 774 So. 2d 649 (Fla. 2000), we affirmed the death

sentence as proportionate where the trial court found that the murder was

committed in the course of a felony, for financial gain, and was especially heinous,

atrocious, or cruel. Id. at 674 n.15. These aggravators were weighed against

mitigation including that the defendant had a failed marriage, exhibited recurrent

substance abuse, had financial instability, suffered the suicide of a friend, had

mental and neurological damage, and was a good citizen, student, and family

member.  Id.  We found that the trial court properly considered and weighed the factors and did not err in finding the death sentence appropriate.  Id.

Campbell directs this Court's attention to several cases in which the Court found the sentence disproportionate in light of substantial mitigation.  In Kramer v. State, 619 So. 2d 274 (Fla. 1993), we vacated the death sentence where the trial court found two aggravators—prior violent felony and HAC—and mitigation consisting of alcoholism, mental stress, severe loss of emotional control, and a possibility of productive functioning in prison.  Id. at 278.  However, the murder in Kramer occurred "in a spontaneous fight, occurring for no discernible reason, between a disturbed alcoholic and a man who was legally drunk."  Id.  The Court found "[t]his case hardly lies beyond the norm of the hundreds of capital felonies this Court has reviewed since the 1970s."  Id.  The present case is factually distinguishable from Kramer.

Campbell cites Nibert v. State, 508 So. 2d 1, 5 (Fla. 1987), in which we remanded for resentencing after striking several aggravators and leaving only HAC.  Campbell also cites DeAngelo v. State, 616 So. 2d 440 (Fla. 1993), in which we found the sentence disproportionate where the only aggravator was CCP and the mitigation was "significant."  Id. at 443.  DeAngelo suffered from bilateral brain damage, hallucinations, delusional paranoid beliefs, Organic Personality Syndrome, Organic Mood Disturbance, psychotic disorder caused by brain

damage, bipolar disorder, and chronic anger.  Id.  We concluded that DeAngelo

was not one of the most aggravated and least mitigated of cases, and thus reduced

the sentence to life without eligibility for parole.  Id. at 443-44.  In the present

case, the mental and other mitigation submitted by Campbell did not approach the

level of mitigation in DeAngelo; moreover, the present case is not a single-

aggravator case.

We are also mindful that in Crook v. State, 908 So. 2d 350 (Fla. 2005), we

vacated the sentence as disproportionate where, although there were three strong

aggravators, the record showed "overwhelming" mitigation including the

defendant's age of twenty, his abusive childhood, brain damage, substance abuse,

and mental mitigation directly relating to the circumstances of the crime.  Id. at

358.  It cannot be said that Campbell's mitigation in this case is "overwhelming" or

even especially compelling.  There was no evidence of brain damage or inability to

know right from wrong, and Campbell was age 37 when he committed the crime.

In the present case, Campbell established mental mitigation primarily

consisting of major depressive disorder and substance abuse.  He proved that he

felt abandoned and rejected by his father, had a difficult childhood with alcoholic

parents, and was under stress from having lost his job.  We conclude that the trial

court did not abuse its discretion in finding and ascribing great weight to the CCP,

prior violent felony conviction, and pecuniary gain aggravators, and in finding that

the aggravators outweigh the mitigators. Based on the weighty aggravator of CCP, the prior violent felony aggravator, which consisted of several serious felonies, and the pecuniary gain aggravator, when considered in light of the mitigation presented and the facts of this case, we find the death sentence in this case is proportionate.

## Sufficiency of the Evidence

Although Campbell does not contest his guilt, we have a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See, e.g., Jones, 963 So. 2d at 184; Blake v. State, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5). In assessing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001).

We find that competent, substantial evidence supports Campbell's conviction for first-degree premeditated murder. The victim was found on August 10, 2010, in his home, lying in a recliner and partially covered. He had several deep gashes into his skull and a hatchet was found nearby with his DNA on it. The medical examiner testified that the victim suffered several chopping-type blows into his head causing a penetrating injury to his brain, and that the wound on the right side of his head would be fatal, either immediately or within a few hours.

Shortly after the murder, when Campbell was being sought by police, Campbell told his girlfriend in a text message that he had killed his father with an ax. Campbell gave multiple statements to detectives. In one statement, he told them that he killed his father with a hammer hatchet and that his father just wanted peace. He told detectives that he sat behind his father and waited, pondering the best way to use the hatchet, and then struck his father. When his father responded, "What was that?" Campbell hit him again. Campbell told detectives that he took his father's credit cards and money and bought items at Walmart and took them to a crack house. In another statement, Campbell told detectives that he thought about killing his father for a few days and decided he would kill his father to bring him peace.

At trial, Campbell testified that he killed his father, but said it was a "snap decision." He explained he only told police he thought about it for days in order to assure that he would get the death penalty because he wanted to die, although this statement was subject to the jury's determination of Campbell's credibility. Based on the evidence presented, including the circumstances of the murder and Campbell's statements to police, the jury had competent, substantial evidence on which to find Campbell guilty of first-degree murder.

## CONCLUSION

Because we find that the HAC aggravator was not proven by competent, substantial evidence, that finding is stricken. However, as we have explained, the error is harmless beyond a reasonable doubt. Thus, for the foregoing reasons, we affirm Campbell's conviction for first-degree murder and the sentence of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Citrus County,
    Richard A. Howard, Judge - Case No. 092010CF001012XXXAXX

James S. Purdy, Public Defender and George Donald Edward Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stacey Elaine Johns Kircher, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee