# Supreme Court of Florida

_____

No. SC17-1725
_____

**JOHN WILLIAM CAMPBELL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC18-260
_____

**JOHN WILLIAM CAMPBELL,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

November 29, 2018

PER CURIAM.

John William Campbell appeals an order of the circuit court denying in part his amended motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851. He further petitions

for a writ of habeas corpus.  We have jurisdiction.  *See* art. V, § 3(b)(1), (9), Fla.

Const.  For the reasons expressed below, we affirm the order of the postconviction

court and deny the habeas petition.

## FACTS AND PROCEDURAL BACKGROUND

Campbell was convicted of the 2010 first-degree murder of his father, John

Henry Campbell (the victim or father), which occurred in Inverness, Florida.  *See*

*Campbell v. State*, 159 So. 3d 814, 818 (Fla.), *cert. denied*, 136 S. Ct. 100 (2015).

Campbell, who elected to testify during trial, admitted he struck the victim in the

head three times with a hatchet.  *Id.* at 823, 838.[1]  The jury recommended the death

penalty by a vote of eight to four.  *Id.* at 827.  The trial court gave great weight to

the recommendation and sentenced Campbell to death.  *Id.* at 829.  The facts

surrounding the crime and the ensuing investigation were described in the opinion

on direct appeal.  *Id.* at 818-23.  Additionally, in the section of the opinion where

we concluded sufficient evidence existed to support the first-degree murder

conviction, a summary of the facts was presented:

> The victim was found on August 10, 2010, in his home, lying in a
> recliner and partially covered.  He had several deep gashes into his
> skull and a hatchet was found nearby with his DNA on it.  The
> medical examiner testified that the victim suffered several chopping-
> type blows into his head causing a penetrating injury to his brain, and

---

1. The terms "hatchet" and "ax" are used interchangeably in the opinion on direct appeal.

that the wound on the right side of his head would be fatal, either immediately or within a few hours.

Shortly after the murder, when Campbell was being sought by police, Campbell told his [former] girlfriend in a text message that he had killed his father with an ax.[2] Campbell gave multiple statements to detectives. In one statement, he told them that he killed his father with a hammer hatchet and that his father just wanted peace. He told detectives that he sat behind his father and waited, pondering the best way to use the hatchet, and then struck his father. When his father responded, "What was that?" Campbell hit him again. Campbell told detectives that he took his father's credit cards and money and bought items at Walmart and took them to a crack house. In another statement, Campbell told detectives that he thought about killing his father for a few days and decided he would kill his father to bring him peace.

At trial, Campbell testified that he killed his father, but said it was a "snap decision." He explained he only told police he thought about it for days in order to assure that he would get the death penalty because he wanted to die, although this statement was subject to the jury's determination of Campbell's credibility.

*Id.* at 838.

Campbell gave five recorded statements to law enforcement. *Id.* at 821-23. *Miranda*[3] warnings were given before each statement. *Campbell*, 159 So. 3d at 821-23. Four of the statements were given at Bayfront Medical Center in St. Petersburg, Florida, where Campbell was life-flighted after he intentionally struck a marked police car with his vehicle during a high-speed chase in an attempt to

_____

2. Campbell also told her to "call the cops" and show them the text messages. *Id.* at 820.

3. *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 3 -

commit suicide. *Id.* at 821-23.[4] The fifth statement was given at the Citrus County jail after Campbell was discharged from the hospital. *Id.* at 823.

In imposing a sentence of death, the trial court found the existence of four aggravating factors: (1) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (2) pecuniary gain (great weight); (3) the murder was heinous, atrocious, or cruel (HAC) (great weight); and (4) prior violent felony (great weight). *Id.* at 827-28. The prior violent felony aggravating factor was based upon Campbell's 1998 conviction in Texas for attacking his sister-in-law and attempting to strike her on the head with a hammer after breaking into her apartment, as well as Campbell's Florida convictions for attempted first-degree murder of a law enforcement officer and aggravated assault on a law enforcement officer with a deadly weapon, arising from his striking of the marked police car during the high speed chase. *Id.* at 827. Deputy Sam Ruby was standing in front of the stopped police car waiting to deploy stop sticks when Campbell, traveling at approximately one hundred miles per hour, veered toward the car and crashed into it. *Id.* at

---

4. The chase commenced when a Citrus County detective who was attempting to locate Campbell spotted him driving and began to follow him. *Id.* at 820. Campbell pulled off the highway, but when the detective pulled behind Campbell and activated the vehicle's lights and siren, Campbell fled back onto the highway. *Id.*

820-21. Deputy Ruby, who had to flee to avoid being hit by Campbell's vehicle, was struck with debris from the crash. *Id.* at 821, 824.

The trial court found two statutory mitigating circumstances: (1) the murder was committed while Campbell was under the influence of an extreme mental or emotional disturbance (little weight); and (2) Campbell's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (extremely little weight). *Id.* at 828. The court also found four nonstatutory mitigating circumstances: (1) family history of depression, a difficult childhood, and a broken relationship with his own son (very slight weight); (2) extensive history of drug use (very slight weight); (3) Campbell experienced depression as a result of the loss of a job and from his relationship with his father (very slight weight); and (4) remorse (extremely little weight). *Id.* at 828-29.

On direct appeal, Campbell raised five issues: (1) whether the trial court erred in finding the CCP aggravator; (2) whether the trial court erred in finding the pecuniary gain aggravator; (3) whether the trial court erred in finding the HAC aggravator; (4) whether Florida's death penalty sentencing scheme is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002); and (5) whether the death sentence was proportionate. 159 So. 3d at 829-35. This Court struck the HAC aggravator but affirmed Campbell's conviction and sentence. *Id.* at 834, 838.

On September 19, 2016, Campbell filed a Motion to Vacate Judgment and Sentence, raising eleven claims. The claims were: (1) Campbell's initial confessions and *Miranda* waivers were involuntary due to trauma, medications, and police misconduct, and trial counsel was ineffective for failing to provide prompt assistance to Campbell; (2) trial counsel was ineffective for failing to object to, or move for a mistrial based on, improper comments by the prosecution, and also for failing to request that the jurors be individually questioned as to whether they overheard one prosecutor make a pejorative comment to the other during the direct examination of Campbell; (3) trial counsel was ineffective for introducing, or opening the door to the introduction of, evidence of nonstatutory aggravating factors; (4) trial counsel was ineffective for failing to fully investigate and present mitigating evidence; (5) cumulative error; (6) Campbell's death sentence violates *Hurst v. Florida*, 136 S. Ct. 616 (2016), and related cases; (7) the enactment of chapter 2016-13, Laws of Florida, demonstrates that standards of decency no longer permit a death sentence to be based upon a bare majority jury recommendation; (8) Florida's capital sentencing statute fails to prevent the arbitrary and capricious imposition of the death penalty and violates the guarantee against cruel and unusual punishment; (9) lethal injection constitutes cruel and unusual punishment; (10) section 945.10, Florida Statutes (2018), is unconstitutional; and (11) Campbell may be incompetent at the time of execution.

On January 27, 2017, Campbell amended claims four, six, and seven of his motion. As is relevant to this case, Campbell deleted claims six and seven in their entirety and replaced them with claims that he is entitled to relief from his sentence based upon *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), and related cases. On February 21, 2017, the postconviction court held a case management hearing, during which it granted an evidentiary hearing on claim one and the subparts of claim two that involved comments made by the prosecution during the guilt phase. The court granted claim six, and awarded Campbell a new penalty phase based upon *Hurst*. The court concluded that relief on claim six rendered the other penalty-phase claims moot, and those claims were dismissed.

During the evidentiary hearing, Campbell presented as witnesses trial counsel, assistant public defenders Michael Lamberti and Thomas Devon Sharkey; and Dr. James O'Donnell, an associate professor of pharmacology, who testified as to the effects of the medications Campbell received while he was hospitalized and in the immediate days after his release on his ability to waive his *Miranda* rights. Campbell attempted to present attorney Norman Adam Tebrugge to give expert testimony as to whether the actions of trial counsel were deficient. However, the State objected, and the postconviction court sustained the objection. The court also declined to permit a proffer by Tebrugge as to the importance of "early contact with the accused in a homicide case." The State presented no witnesses. On

August 30, 2017, the postconviction court issued an order that denied claim one, the guilt-phase subparts of claim two, and the cumulative error claim. Thus, the court granted in part, dismissed in part, and denied in part Campbell's amended rule 3.851 motion.

This appeal follows. On February 16, 2018, Campbell filed a petition for writ of habeas corpus.

## ANALYSIS

*Failure to Seek Suppression of Statements*

Campbell first asserts that trial counsel was ineffective for failing to seek suppression of the five statements given to law enforcement in the days following his arrest. We have described the requirements to demonstrate ineffective assistance of trial counsel as follows:

> First, counsel's performance must be shown to be deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. *Id.* When examining counsel's performance, an objective standard of reasonableness applies, *id.* at 688, and great deference is given to counsel's performance. *Id.* at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 669.
> Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a

- 8 -

reliable result. *Strickland*, 466 U.S. at 689. A defendant must do more than speculate that an error affected the outcome. *Id.* at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Both deficient performance and prejudice must be shown. *Id.* Because both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

*Bradley v. State*, 33 So. 3d 664, 671-72 (Fla. 2010) (alteration in original).

Because *Strickland* requires a defendant to establish both prongs, if one prong is not met, it is not necessary to reach the other. *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001).

On direct appeal, we described the statements given by Campbell:

Hernando County Sheriff's Detective Thomas Breedlove, who on August 12, 2010, was investigating Campbell's car crash near the Hernando/Citrus County line, accompanied Citrus County Detective Gary Atchison to the Bayfront Medical Center where they spoke to Campbell. After reading him his *Miranda* rights, Campbell waived his rights and spoke with them, which interview was recorded. In the recording, which was played for the jury and showed Campbell waiving his *Miranda* rights, Detective Atchison advised Campbell that they found his father and had spoken to [Campbell's former girlfriend]. . . . When Campbell said he was in a lot of pain, Atchison asked if it was his knee, and Campbell said that was not what he was talking about, and when asked if he was mentally all right, Campbell said, "No, I want to fuckin' die" and "Until I die, I'm not going to be at peace with myself." Campbell told the officers that he would not stop trying to kill himself until he was dead, and that he was going to commit suicide. Campbell said he crashed the car intentionally and had taken off his seat belt before the crash. When asked if he wanted

- 9 -

to die because of what he had done recently, he responded that it was because of his whole life. Campbell then started to cry.

When Atchison asked him again about his father, Campbell said he did not want to talk about that and he wanted a lawyer. He then said, "Unless y'all give me the death penalty, I don't want to talk." The detective responded that they were finished talking and turned off the tape. Detective Atchison testified that when the recorder was shut off, Campbell said he wanted to retract his request for a lawyer, and the detective again read Campbell his rights. At that point, Campbell told the detectives he would continue to talk about his father if he could get some pain medication for his knee. A nurse sought authority for pain medication but none was authorized at that time. When the detectives advised Campbell of this, he said, "What's the use," and demanded that they turn the recorder back on.

An audio recording was then made of the second statement Campbell made at the hospital. This statement was played for the jury and, in it, Campbell was read his *Miranda* rights again, which he waived, and said he did not want a lawyer. When asked if he had murdered his father, Campbell said, "Yes." When asked how, he responded, "It was a hammer hatchet." When asked how many times he hit his father, Campbell said "twice." When asked what happened prior to the murder, Campbell started crying and said, "Years. All this shit's been going on for years," and that "[h]e just never talked to me. I tried and any time I'd express my opinion . . . ." Campbell said his father would not talk, but would just sit, and was miserable and angry and bitter, and kept saying he wanted peace. Campbell said, "And I was like, You know what? I can give you peace, and that's when I—I sit behind him and waited and I just hit him." Campbell told the detectives:

> JOHN CAMPBELL: (Crying) I was sitting—yeah, I was sitting at the computer (moaning) and I hit him and he said—he said, "What was that?" And I hit him again and that was it. He died. I covered him up and I put my sister's picture on him because that was who he loved. He didn't—he didn't care about anybody else. He didn't care about me. He just wanted peace and I gave it to him. You know, my family wanted money, so now they got it. I don't want nothing. I want to die.

Campbell admitted to wiping off the hammer hatchet with a "scrubby pad" at the sink.

. . . Campbell then related that after the murder he drove around, going to Silver Springs near Ocala, then to Hillsborough and Pinellas counties and back toward Citrus County. Campbell again stated that the car crash was an attempt to kill himself and he was not trying to hurt the officer, "[s]o I don't want no attempted murder on no officer."

A third recorded formal statement was taken from Campbell at the Bayfront Medical Center on the morning of August 13, 2010, and it was played for the jury. Campbell was again read his *Miranda* rights, which he waived. He related that before the murder, he had purchased groceries at Walmart and had gone to Lowe's. When he got home, he put the groceries away. He could not say how long he was home before the murder, but at some point, he got the ax from a toolbox outside the house. He waited a while before hitting his father and, during that time, was not arguing with him. After the murder, Campbell opened his father's strongbox but found nothing in it. However, he found a stack of $2 bills in his father's dresser. Campbell admitted he was looking for money and that he took his father's wallet and some credit cards. He left the house, he said, "to buy crack" and admitted to using his father's credit card at Walmart to purchase gift cards, cigarettes, gas, and some rugs. He explained that a friend in Ocala asked him "to get some rugs, so I bought some damn rugs" for the "crack house" and, after he did so at Walmart, he took the rugs there. He also took the gift cards and traded them for crack.

. . . After leaving the crack house, he drove back by his father's house, but saw a lot of police cars there so he "hauled butt." He subsequently found himself on I-275 in the Tampa area and planned to keep driving, and when he ran out of gas, he said, he "was gonna kill [himself] somehow." At some point, he was driving on Highway 19 and drove back to Citrus County, he said again, in order to kill himself.

This ended the playing of the third recorded statement. Detective Atchison explained that a short time later . . . after Atchison and Campbell spoke off the record, Atchison asked if he could turn the recorder back on for a fourth statement. Detective Atchison again advised Campbell of his *Miranda* rights. Campbell was asked about the point at which he pulled over while driving and was subsequently followed by one of the vehicles attempting to stop him. Campbell

- 11 -

admitted that he took off when the officer turned on the police lights. Campbell said he was driving at least 110 miles per hour and that when he decided to ram a marked police car at that speed, he did not know if there was an officer inside or near the vehicle, but was just trying to kill himself. . . .

Also in this fourth statement, Campbell agreed that he told Atchison off the record that he hit his father three times with the ax. He related that he was sitting behind his father, then got up and swung the ax from behind his father's recliner. He said that before he hit his father, he kept flipping the ax trying to decide whether to hit him with the sharp end or the flat end of the metal head of the ax. After the first blow, his father yelled, "What was that?" Campbell said, "[H]e might have even sit up, but I don't think so." Campbell agreed that when he hit his father the second time, he used both hands and "buried the hatchet" inside his father's head, feeling the skull give. . . . When he saw his father's hand reach up about five minutes later, Campbell hit him again. During that five-minute period, Campbell was pacing and looking for valuables in the house. He said he hit his father the third time because he did not want him to suffer. . . .

Detective Atchison left the hospital on August 13, 2010, but met with Campbell again when he was in the Citrus County jail on August 16, 2010, at Campbell's request. Atchison again advised Campbell of his *Miranda* rights. In this fifth statement, Campbell began by saying, "As far as the murder goes—oh, God, it's hard for me to say, but, you know, I've wanted to put him to death for a few—for a few days." Campbell said he had been "meditating" on it and did not know how, but knew he would do it eventually. He said it was "[f]or peace, mostly." Campbell said he and his father were both mentally suffering and Campbell finally "just snapped . . . . I just—you know, and I guess I wanted to do it, you know?"

*Campbell*, 159 So. 3d at 821-23 (some alterations in original). Trial counsel did not move to suppress any of the statements.

During the postconviction evidentiary hearing, Dr. O'Donnell testified that he reviewed Campbell's medical records from Bayfront Medical Center, where Campbell was taken after the crash, as well as his jail records after he was

discharged.  Dr. O'Donnell also interviewed Campbell on March 29, 2017.  During the interview, Campbell informed Dr. O'Donnell that he once had an adverse reaction to a relatively low dose of Vicodin, an opioid, where he felt "out of control."  According to Dr. O'Donnell, Campbell's prior experience of "significant cognitive impairment" with a relatively low dose of opiates would have great relevance in evaluating the effects of the high dosages of opiates that Campbell received post-traumatically and post-operatively.  Dr. O'Donnell noted that although Campbell had abused cocaine and methamphetamine in the past, he had not abused opiates.  Therefore, Campbell was "opiate naive," i.e., he had no tolerance for opiates, which impact different receptors in the brain.

Dr. O'Donnell testified that between August 10, 2010, and August 17, 2010, Campbell was given the opiates morphine and oxycodone,[5] as well as the sedative Diprivan.  According to Dr. O'Donnell, morphine affects deliberation and judgment, it can release inhibitions, and it has also been reported to cause hallucinations.  Oxycodone, which is more potent than morphine for pain purposes, can produce the same effects.  Finally, because Diprivan impacts the "control center of the brain," the drug "releases all controls on inhibitions."  Dr. O'Donnell

---

5. Campbell initially received the synthetic opiate fentanyl in transport to and at the hospital.  However, the drug was discontinued, and Dr. O'Donnell testified that Campbell "clearly was not under the influence of fentanyl" at the time of the hospital statements.

further stated that the additive effect of each of these drugs increases the risk of impairment, as can the additional impact of trauma, surgery, anesthesia, and mental distress. According to Dr. O'Donnell, a patient who is impaired might not exhibit visible signs of impairment. He reviewed which of these medications Campbell received prior to each of the statements and concluded that Campbell's judgment was impaired during each statement. Dr. O'Donnell stated he would never recommend that an "opiate-naive" patient make decisions while under the influence of any of these drugs because they "inhibit the ability to make decisions and people make bad decisions because they're not exercising judgment, they're not exercising controls."

On cross-examination, Dr. O'Donnell verified he had listened to the recordings of Campbell's statements. He admitted his opinion was based in part upon what Campbell told him and not on his personal observation of Campbell at the time he made the statements to law enforcement. On redirect, Dr. O'Donnell testified that although the dosages given to Campbell were normal for a patient who is in an intensive care unit, they would still cause impairment in an "opiate-naive" patient, even if the patient is coherent.

Trial counsel Sharkey believed the most damaging part of the case was Campbell's statement at the Citrus County jail that he had been thinking about killing his father for a few days, because it elevated simple premeditated murder

for a first-degree murder conviction to heightened premeditation for purposes of the death penalty. Therefore, the defense strategy was to try to obtain a second-degree murder conviction, and then, if the jury found Campbell guilty of first-degree murder, to attempt to obtain a life recommendation. After noting that the jail statement seemed "very cold, emotionless," Sharkey testified:

> I found the statements that he made in the hospital to be more emotionally fraught. They were—he was clearly, you know, very emotional, upset. They seemed far more—he even seemed remorseful at times. He made it seem far more spontaneous in those statements. . . . [T]he decision was made because I felt that they, too, contradicted or kind of rebutted the heightened premeditation of the last statement.

Consistent with this strategy, trial counsel discussed Campbell's hospital statements "at some length" with penalty-phase defense expert Dr. Peter Bursten—specifically, "[t]he fact that he was emotional, the fact that he was going through all this turmoil, [which] is what Dr. Bursten testified to on the stand."

Counsel was presented with a difficult case to defend during the guilt phase. In addition to other incriminating evidence, prior to the accident and the statements at issue, the defendant sent a text message to his former girlfriend admitting that he killed his father with an ax. *Campbell*, 159 So. 3d at 820.[6] He used his father's credit card multiple times after the murder to purchase items, and further

---

6. When she asked Campbell via text message, "Why would you do that 2 him," Campbell responded, "He is no more."

telephoned the bank when the credit card was declined in an attempt to have the account reactivated. *Id.* at 819. Trial counsel made a strategic decision not to seek suppression of the hospital statements because they felt that during these statements, Campbell exhibited remorse for the killing of his father. A review of the recordings of the hospital statements reflects that at times, Campbell was emotional and crying. Sharkey believed Campbell appeared to be more sincere during the hospital statements than he was at the jail, where he stated he had been "meditating" on killing his father. 159 So. 3d at 823.

We have concluded that trial counsel was not ineffective where a strategic decision was made to introduce a defendant's statements with the goal of negating or reducing the defendant's culpability. *See, e.g.*, *Johnston v. State*, 70 So. 3d 472, 481-82 (Fla. 2011) (counsel not ineffective for failure to seek suppression of the defendant's statements because they provided an alternate reason why the defendant's fingerprints were in the victim's bathroom where the body was found); *Lawrence v. State*, 969 So. 2d 294, 308-09 (Fla. 2007) (counsel made a strategic decision not to seek suppression of the defendant's statements in order to demonstrate the codefendant was the more culpable party and the defendant was under his influence).

Further, trial counsel did not believe there was a basis to seek suppression of the jail statement. This conclusion is supported by the direct appeal record, which

reflects it was Campbell who initiated the discussion with Detective Atchison by *affirmatively requesting* he visit Campbell at the jail. *Id.* Moreover, after confirming that Campbell wanted to speak with him, and before allowing Campbell to speak, Detective Atchison read the *Miranda* warnings again to ensure that Campbell did not wish to have a lawyer present during this discussion. *Id.* Finally, when Campbell states, "I've wanted to put him to death for . . . a few days," the recording reflects that he is coherent. He interacts with Detective Atchison in a normal fashion and is not behaving erratically. Had trial counsel moved to suppress the jail statement, the motion would not have been successful. Accordingly, Campbell cannot demonstrate he was prejudiced by counsel's actions with respect to the jail statement, and they were not ineffective. *See Kormondy v. State*, 983 So. 2d 418, 430 (Fla. 2007) ("[T]rial counsel cannot be deemed ineffective for failing to argue a nonmeritorious motion to suppress.").

In conclusion, Campbell has failed to demonstrate that if trial counsel had sought to suppress the jail statement, the motion would have been successful. Therefore, to counter the jail statement—which evidenced premeditation—trial counsel made a reasonable strategic decision not to seek suppression of the hospital statements. Based upon the foregoing, trial counsel was not ineffective, and we affirm the denial of this claim.

*Failure to Provide Prompt Assistance*

Campbell next asserts trial counsel was ineffective for failing to provide prompt assistance to him. Campbell asserts that, as soon as the fact of his arrest became common knowledge, the Fifth Judicial Circuit Office of the Public Defender had an obligation to make contact with him to prevent uncounseled admissions. As part of this claim, he also asserts that the postconviction court erred in not allowing attorney Tebrugge to testify as to the prevalence and necessity of a rapid response by attorneys in capital cases.

Campbell is not entitled to relief because the Office of the Public Defender had not yet been appointed to represent him at the time he gave the five statements to law enforcement on August 12, 13, and 16. Accordingly, Campbell was not a client of that office during that time, and its attorneys had no duty to him. The Office of the Public Defender was first appointed to represent Campbell on August 17, 2010, in one of his noncapital cases. Although Campbell signed a Notice of Intent to Invoke Right to Counsel and Exercise Right to Remain Silent the same day, the Office of the Public Defender did not officially represent him until that time, and advising Campbell before then was not its responsibility.

We previously addressed a capital defendant's claim that an assistant public defender was ineffective for failing to communicate with him prior to appointment and advise him not to speak to law enforcement. In *Everett v. State*, 54 So. 3d 464

(Fla. 2010), within hours of a Florida murder (and other crimes), the defendant was captured by an Alabama bail bondsman who transferred the defendant back to Alabama where he was wanted as a fugitive. *Id.* at 470. Two Florida law enforcement officers subsequently connected the defendant to evidence found near the Florida crime scene and traveled to Alabama. *Id.* During the time the defendant was in an Alabama county jail, he confessed to the Florida crimes in a statement to a Florida law enforcement officer. *Id.*

We held that the Florida assistant public defender (attorney Smith) was not ineffective for failing to advise the defendant not to speak to law enforcement under these circumstances:

> Because attorney Smith had not then been appointed to represent Everett, attorney Smith was not ineffective for failing to communicate with Everett while Everett was in Alabama custody—before Everett was ever charged with any Florida offense. . . .
> Chapter 27, Florida Statutes (2001), and Florida Rule of Criminal Procedure 3.111 offer guidance on when a public defender is "representing" a defendant. Section 27.51(1)(a), Florida Statutes (2001), provides in pertinent part that "[t]he public defender shall represent . . . any person who is determined by the court to be indigent as provided in s. 27.52 and who is . . . [u]nder arrest for, or is charged with, a felony." Section 27.51(2) adds that "[t]he court may not appoint the public defender to represent, even on a temporary basis, any person who is not indigent." § 27.51(2). Chapter 27 is in agreement with Florida Rule of Criminal Procedure 3.111(a), which provides that "[an indigent] person entitled to appointment of counsel . . . shall have counsel appointed when the person is formally charged with an offense, or as soon as feasible after custodial restraint, or at the first appearance before a committing magistrate, whichever occurs earliest." Rule 3.111(b)(5) states also that "[b]efore appointing a public defender, the court shall . . . make inquiry into the financial

- 19 -

status of the accused in a manner not inconsistent with the guidelines established by section 27.52, Florida Statutes. The accused shall respond to the inquiry under oath." Finally, the rules provide that the court shall "require the accused to execute an affidavit of insolvency as required by section 27.52, Florida Statutes." Fla. R. Crim. P. 3.111(b)(5)(C).

In this case, at the time that Everett was in Alabama and gave statements to law enforcement officers, the Florida trial court had not determined that Everett was indigent, as required by both sections 27.51-.52 and rule 3.111(b)(5). Likewise, attorney Smith had not been appointed as counsel and was not "representing" Everett according to sections 27.51-.52 and rule 3.111 because Everett had not been formally charged, was not under custodial restraint in Florida, and had not had a first appearance for his Florida charges. Specifically, Everett made statements to law enforcement in November 2001, while in Alabama custody for an Alabama charge; Everett was indicted for the Florida crimes in late January 2002; and the trial court determined that Everett was entitled to a Florida public defender in late February 2002 upon determining that Everett was indigent. Based on this timeline, it was impossible for attorney Smith, as an assistant public defender, to have been "representing" Everett at the time that Everett made the statements in Alabama. Because attorney Smith was not yet representing Everett as defined by Florida Law, attorney Smith was not yet responsible for advising Everett.

*Id.* at 472-73 (alterations in original). Here, as in *Everett*, at the time Campbell gave the five statements to law enforcement, he had not been formally charged with any crimes, he had not been given a first appearance, and the Office of the Public Defender had not yet been appointed to represent him.[7] Accordingly, trial counsel was not ineffective for failing to respond to Campbell sooner.

---

7. However, unlike *Everett*, Campbell was under custodial restraint in Florida from the time of the car crash onward. After discharge from the hospital, Campbell was taken to the Citrus County jail.

Further, because the Office of the Public Defender had no duty to Campbell prior to its appointment on August 17, 2010, defense witness Tebrugge's testimony as to the importance of "early contact with the accused in a homicide case" would not have been relevant to whether trial counsel here was ineffective. Accordingly, the postconviction court did not abuse its discretion in not permitting Tebrugge to testify. *See Frances v. State*, 970 So. 2d 806, 813 (Fla. 2007) ("A trial court's rulings as to . . . excluded evidence should be reviewed under the abuse of discretion standard."). We affirm the denial of this claim.

*Failure to Request Inquiry/Object*

In his third claim, Campbell contends trial counsel was ineffective both for failing to request an inquiry of the jurors as to whether any of them heard an inappropriate comment made by a prosecutor and for failing to object to an argument made during guilt-phase closing statements. We conclude that the postconviction court properly rejected both challenges.

With respect to the inappropriate comment, the direct appeal record reflects that while Campbell was testifying as to his strained relationship with his father, trial counsel Sharkey asked to approach the bench. At sidebar, Sharkey informed the court that he heard one prosecutor whisper to the other, "What a manipulative ass." Sharkey moved for a mistrial, stating, "If I could hear it and I'm not far from the jury . . . I can't be certain that a juror didn't hear that and I think that's

- 21 -

extremely inappropriate." The prosecutor admitted he made the comment and apologized to trial counsel and the court. In response to the motion, the prosecutor stated there was no evidence that anyone other than Sharkey heard the comment, and "[i]f [Sharkey] wants an inquiry made of the juror[s], I mean, the Court does not have any evidentiary foundation to support the granting of a mistrial." Sharkey did not ask for an inquiry, and the trial court denied the motion.

During the evidentiary hearing, no evidence was presented to support the assertion that a juror may have heard the statement. Sharkey testified he did not request an inquiry because it would "draw even more attention to the incident and take up more time while the client's on the stand, so I just elected to move on from there." In concluding that trial counsel was not ineffective, the postconviction court noted the improper comment occurred during Campbell's testimony, and while the jurors' attention was directed toward Campbell.[8]

Trial counsel's decision not to seek individual voir dire was a reasonable strategy. The prosecutor's improper comment was made during the most important part of the defense's case—while Campbell was describing the tense, strained relationship with his father, and how the tensions escalated until the time of the murder. Had trial counsel requested individual voir dire, it would have

8. The judge who presided over the postconviction proceedings is the same judge who presided over the capital trial.

- 22 -

disrupted the flow of Campbell's testimony and broken the jurors' concentration. Further, had voir dire demonstrated that none of the jurors heard the whispered comment, once Campbell recommenced testifying, the attention of the jurors easily could have been diverted into speculation as to what the comment was. Thus, it was a reasonable decision for trial counsel not to call attention to the improper comment and simply proceed with Campbell's testimony. *See Johnson v. State*, 135 So. 3d 1002, 1016-17 (Fla. 2014) (counsel not deficient for failing to request a limiting instruction with respect to witness's testimony that victim asked for her children while being strangled because the request "would have drawn further attention to the emotionally charged comment").

Further, even if counsel was deficient for not requesting individual voir dire, Campbell has failed to demonstrate prejudice. As previously discussed, Campbell did not offer any evidence that a juror heard the improper comment and, therefore, any allegations of prejudice are purely speculative. Accordingly, he has not met the burden of showing a reasonable probability that, but for the failure to request individual voir dire, the outcome of the guilt phase would have been different, and confidence in the outcome has not been undermined. *Bradley*, 33 So. 3d at 672.[9]

---

9. We remind all attorneys to be cognizant of any spoken comments and to always maintain decorum in the courtroom. The statement by the prosecutor here was completely inappropriate.

Campbell further alleges ineffectiveness based upon trial counsel's failure to object to the following argument during guilt-phase closing statements on the basis that it shifted the burden of proof to Campbell:

> You know, the Court is going to tell you and give you some guidance in evaluating the evidence in the case, the witnesses' testimony in the case, and that the defendant is to be treated just like any other witness in the case. Some of the guidelines is [sic] does the witness'[s] testimony agree with the other evidence and the other testimony in the case?
>     It's been proven that the witness was convicted of a felony. Well, we know that [the] defendant is not a one-time convicted felon or a four-time convicted felon, he's a seven-time convicted felon. But he was stressed and he was depressed, he was in a fog, he was in a daze, he was in shock, it didn't register, he couldn't piece it together.
>     If you want to believe that, go right ahead. I can't stop you. *Let him walk out the back of that courtroom door.* I submit to you that flies in the face of the other evidence and the other testimony with regard to this case.
>     . . . [G]iven all the testimony and the evidence that you've heard in this case proves that [the] defendant is guilty as charged in the indictment of murder in the first degree.

(Emphasis added.)

During the evidentiary hearing, Sharkey testified that while he did not believe the emphasized statement was objectionable, he thought it was "silly" and a "sort of absurd thing for [the prosecutor] to say." Sharkey explained that "Campbell himself said that he knew he wasn't getting out of this and he was going to do life when he was on the stand. So I think I answered [the prosecutor] right back when I had a chance." The trial record reflects that Sharkey's first point raised during guilt-phase closing statements was with respect to this comment:

- 24 -

[The prosecutor] said, If you want to let him walk out that door, you let him walk out that door. He's not going to walk out that door. You know he's not going to walk out that door. He said on the stand yesterday he knows he's not going to walk out that door. We're not even going to ask you to let him walk out that door.

Sharkey reaffirmed this assertion two more times during closing statements. The final reference to the comment was made in the context of arguing that Campbell should not be found guilty of first-degree murder, but second-degree murder:

And as I said, I'm not asking you to let him walk out that door. He never said he was going to walk out that door. He knew where— he knows where he's going because there's other alternatives. *We're not asking you for not guilty of every charge.* There are other offenses and you'll be charged with these.
You'll have a whole host of lessers that you'll be charged on . . . . [A]nd on the board right here as you've seen is second-degree murder.

(Emphasis added.) Sharkey proceeded to discuss the elements of second-degree murder and concluded, "That's what works here." Sharkey completed the guilt-phase closing statement by stating, "When you apply the facts in this case to that law, you will find the only true and correct verdict is something less than first-degree murder."

In denying this claim, the postconviction court concluded the prosecutor's statement did not shift the burden to Campbell because it did not "rise to the level of challenging the defendant's failure to refute the evidence or denigrate defense's theories." The court also noted the statement only questioned the reliability of Campbell's testimony, and counsel made the strategic decision to address it during

- 25 -

closing statements.  As a result, the court concluded trial counsel had no basis to object to the statement, and they were not ineffective.

We agree with the postconviction court's findings and holding.  This Court has explained that "an attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254-55 (Fla. 2006).  "The credibility of a criminal defendant who takes the stand and testifies may be attacked in the same manner as any other witness." *Chandler v. State*, 702 So. 2d 186, 195-96 (Fla. 1997) (quoting Charles W. Ehrhardt, *Florida Evidence*, § 608.1, at 385 (1997 ed.)).  Nevertheless, "it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt." *Gore v. State*, 719 So. 2d 1197, 1200 (Fla. 1998).

Here, the challenged statement was made in the context of the State contending that Campbell's testimony was inconsistent with the other evidence presented during trial.  The gist of the statement was if the jury found Campbell credible, it had the option of acquitting him; however, the other evidence and testimony supported a conviction for first-degree murder.  This argument did not shift the burden of proof to Campbell to demonstrate he was innocent or guilty of a lesser offense.  *Cf. Hayes v. State*, 660 So. 2d 257, 265 (Fla. 1995) (trial court erred

when it allowed the prosecutor to elicit testimony and argue in closing that the defense failed to request testing of various pieces of evidence because the prosecutor's questions and comments "may have led the jury to believe that Hayes had an obligation to test the evidence found at the scene of the murder and to prove that the hair and blood samples did not match his own").

At worst, the statement could be viewed as misleading; i.e., if the jury believed Campbell's version of events, it was *required* to acquit him. Even under this scenario, however, Sharkey corrected any potential misconception multiple times during his closing statement by informing the jurors (1) the defense was not asking the jury to acquit Campbell, (2) Campbell knew he was not going to be acquitted, and (3) the evidence supported a conviction for second-degree murder. Therefore, Campbell has failed to demonstrate trial counsel was deficient for failing to object to the comment.

We affirm the denial of this claim.

### *Cumulative Error*

Finally, Campbell claims the cumulative effect of the errors that occurred during the guilt phase deprived him of his constitutional right to a fair trial. However, where the individual claims asserted by a defendant are without merit, a claim of cumulative error will fail. *Israel v. State*, 985 So. 2d 510, 520 (Fla. 2008).

Because each of Campbell's challenges lacks merit, he is not entitled to relief based upon cumulative error.

## PETITION FOR WRIT OF HABEAS CORPUS

In his habeas petition, Campbell presents three claims of ineffective assistance of appellate counsel. In considering such claims, the Court evaluates:

> [F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
>
> *Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986). It is the defendant's burden to allege a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based. If a legal issue "would in all probability have been found to be without merit" had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective.

*Frances v. State*, 143 So. 3d 340, 357 (Fla. 2014) (citation omitted) (quoting *Rutherford v. Moore*, 774 So. 2d 637, 643 (Fla. 2000)).

*Denial of Request for Mistrial*

In his first claim, Campbell contends appellate counsel was ineffective for failing to appeal the trial court's denial of the request for a mistrial when trial counsel heard one prosecutor whisper to the other, "What a manipulative ass"

during Campbell's testimony. Campbell has failed to demonstrate appellate counsel was ineffective. We have explained:

> "A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding." For a new trial to be warranted, the comments "must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise."

*Delhall v. State*, 95 So. 3d 134, 169 (Fla. 2012) (citations omitted) (quoting *Wade v. State*, 41 So. 3d 857, 872 (Fla. 2010), and *Brooks v. State*, 918 So. 2d 181, 207 (Fla. 2005)). A trial court's ruling on a motion for mistrial is reviewed for an abuse of discretion. *England v. State*, 940 So. 2d 389, 402 (Fla. 2006). As previously discussed, there is no evidence that any juror heard the prosecutor's comment. In fact, in denying this claim, the postconviction court noted the jurors' attention was directed to Campbell, who was testifying at the time the statement was made. Accordingly, where there is no evidence the comment was even heard, the trial court cannot be deemed to have abused its discretion in refusing to declare a mistrial over the comment.

Moreover, even if one or more jurors did hear the comment, that comment cannot be said to be so prejudicial as to vitiate the entire trial. While unprofessional and crass, the single comment was isolated and not part of opening statements, closing statements, or the State's cross-examination of Campbell. In

whispering this comment to co-counsel, the prosecutor was not urging the jury to convict Campbell on the basis of Campbell's truthfulness or lack thereof. *Cf. Ruiz v. State*, 743 So. 2d 1, 6 (Fla. 1999) (by "characterizing Ruiz as 'Pinocchio' and then telling the jury that 'truth equals justice' and 'justice is that you convict him,' the prosecutor was inviting the jury to convict Ruiz of first-degree murder because he [was] a liar," which crossed the boundary of proper advocacy). Therefore, had counsel appealed the denial of the request for a mistrial, it would "in all probability have been found to be without merit." *Frances*, 143 So. 3d at 357.

Accordingly, we deny this claim.

*Admission of Collateral Crimes Evidence*

Campbell next claims that appellate counsel was ineffective for failing to appeal the admission of collateral crimes evidence—specifically, evidence related to the high-speed chase and collision with the deputy's vehicle. According to Campbell, although the car chase and collision were to some degree inextricably intertwined with the murder, these events were impermissibly allowed to become a feature of the trial. We disagree.

The admissibility of evidence regarding collateral crimes is within the discretion of the trial court, but that discretion is limited by the rules of evidence. *Ballard v. State*, 66 So. 3d 912, 917 (Fla. 2011). Section 90.402, Florida Statutes (2018), provides: "All relevant evidence is admissible, except as provided by law."

However, section 90.403, Florida Statutes (2018), states: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." We have explained:

> "Admissible evidence of uncharged crimes falls into two categories: 'similar fact' evidence and 'dissimilar fact' evidence." *Victorino v. State*, 23 So. 3d 87, 98 (Fla. 2009) (quoting *Zack v. State*, 753 So. 2d 9, 16 (Fla. 2000)) (internal quotation marks omitted). Similar fact evidence, also known as *Williams*-rule evidence, "is governed by the requirements and limitations of section 90.404, [Florida Statutes (2004)]," *id.*[,] which permits "evidence of other crimes, wrongs, or acts . . . when relevant to prove a material fact in issue," such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* (quoting § 90.404, Fla. Stat.). Dissimilar fact evidence is governed by section 90.402 and has been described as follows:
>
>> [E]vidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not *Williams* rule evidence. It is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue . . . . [I]t is necessary to admit the evidence to adequately describe the deed."
>
> *Griffin v. State*, 639 So. 2d 966, 968 (Fla. 1994) (quoting Charles W. Ehrhardt, *Florida Evidence*, § 404.17 (1993 ed.)). The admissibility of both categories—similar fact evidence and dissimilar fact evidence—is determined by its relevancy and, of course, subject to exclusion under the balancing test of section 90.403, Florida Statutes (2010). *Id.* In establishing its case, the State "is entitled to present evidence which paints an accurate picture of the events surrounding the crimes charged," *Griffin*, 639 So. 2d at 970, but cannot "make the evidence of other crimes the feature of the trial or . . . introduce the evidence solely for the purpose of showing bad character or propensity." *Smith v. State*, 866 So. 2d 51, 61 (Fla. 2004).

*Truehill v. State*, 211 So. 3d 930, 945 (Fla. 2017) (second alteration added).

Here, evidence of the chase and crash was necessary to provide the jury with an accurate picture of the events surrounding the murder. The evidence demonstrated how Campbell was apprehended by law enforcement. It reflects that law enforcement did not stop Campbell—Campbell fled from law enforcement, and it was he who ended the chase by crashing his vehicle into a deputy's marked car in an attempt to commit suicide. Further, evidence of the crash provided the jury with context as to why Campbell gave four of his five statements from a hospital bed. Therefore, at issue is whether these events impermissibly became a feature of the trial.

We have carefully reviewed the entire trial record and conclude they did not. The State dedicated less than one-quarter of its opening statement to the chase and crash, which is not excessive. Further, only three of more than one dozen guilt-phase State witnesses testified as to these events in any detail. Finally, the State dedicated only a single sentence to them during its closing statement. Accordingly, had appellate counsel challenged on appeal the admission of the collateral crimes evidence, the claim in all probability would have been found to lack merit. Accordingly, we hold appellate counsel was not ineffective and reject this claim. *Frances*, 143 So. 3d at 357.

*Autopsy Photograph*

Finally, Campbell asserts that appellate counsel was ineffective for failing to appeal the admission of a graphic autopsy photograph into evidence. We disagree. During trial, four autopsy photographs of the victim's injuries were introduced. Exhibits 35, 36, and 37 depicted the victim in the condition in which he was found, and the defense did not object to introduction of these photographs. However, exhibit 38 involved a photograph of the victim's head after the medical examiner folded back the scalp to expose the skull. The medical examiner testified that he "measured an approximately five-by-four-inch area of laceration, disruption of the brain, on [the] right side with bits of embedded tissue, including bone and hair."

When the State attempted to introduce exhibit 38 into evidence, trial counsel objected on the basis that the probative value of the photograph was greatly outweighed by its gruesome nature, and the photograph would inflame the passions of the jury. The trial court reviewed the photograph and, while concluding it was "to . . . the average sensibility[,] a little rough," the testimony indicated there had been chopping-type injuries not only to the skull, but into the victim's brain. The court concluded "the defendant essentially takes the evidence of their crime as it is found" and admitted exhibit 38 into evidence.

The admission of photographic evidence is reviewed for abuse of discretion. *Philmore v. State*, 820 So. 2d 919, 931 (Fla. 2002). We have explained:

"The test for admissibility of photographic evidence is relevancy rather than necessity." *Pope v. State*, 679 So. 2d 710, 713 (Fla. 1996). . . . This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner's testimony, the manner of death, or the location of the wounds. *See, e.g.*, *Philmore*, 820 So. 2d at 932 (autopsy photograph was relevant to show the nature and extent of the bullet wound, and for demonstrating premedition); *Floyd v. State*, 808 So. 2d 175, 184 (Fla. 2002) (autopsy photographs "were relevant to show the circumstances of the crime and the nature and extent of the victim's injuries"); *Brooks v. State*, 787 So. 2d 765, 781 (Fla. 2001) (five autopsy photographs were relevant to the medical examiner's determination as to the manner of the victim's death); *Pope*, 679 So. 2d at 713-14 (autopsy photographs were relevant to illustrate the medical examiner's testimony and the injuries he noted); *Wilson v. State*, 436 So. 2d 908, 910 (Fla. 1983) (nine autopsy photographs were admissible because they were relevant to show identity, the nature and extent of the victims' injuries, the manner of death, the nature and force of the violence used, and premeditation).

However, even where photographs are relevant, the trial court must still determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence." *Czubak v. State*, 570 So. 2d 925, 928 (Fla. 1990) (quoting *Leach v. State*, 132 So. 2d 329, 331-32 (Fla. 1961)) (second alteration in original).

*Douglas v. State*, 878 So. 2d 1246, 1255 (Fla. 2004) (alterations in original).

There is no question that exhibit 38 is graphic, depicting a significant chopping wound to the brain. However, the photograph was relevant to illustrate the nature and extent of the victim's injuries, as well as the medical examiner's testimony. Exhibit 38 is no more inflammatory than autopsy photographs in other cases where we held they were relevant to show the nature of the victim's injuries and were not unduly prejudicial. *See, e.g.*, *Patrick v. State*, 104 So. 3d 1046, 1061-

62 (Fla. 2012) ("[P]hotographs . . . depicting the skin of the victim's head pulled back to reveal his skull and the entire torso opened to reveal his upper chest . . . were provided to demonstrate the internal injuries sustained since they were not otherwise visible.").

Therefore, had appellate counsel appealed the introduction of exhibit 38, the claim in all probability would not have been successful. Accordingly, appellate counsel was not ineffective for failing to raise this claim on direct appeal. *Frances*, 143 So. 3d at 357.

## CONCLUSION

Based upon the foregoing, we affirm the postconviction court's order and deny habeas relief.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED WITHIN SEVEN DAYS. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED WITHIN FIVE DAYS AFTER THE FILING OF THE MOTION FOR REHEARING/CLARIFICATION. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Citrus County,
    Richard A. Howard, Judge - Case No. 092010CF001012XXXAXX
And an Original Proceeding – Habeas Corpus

Maria DeLiberato, Capital Collateral Regional Counsel, Middle Region, Julie A. Morley, Margaret S. Russell, and Mark S. Gruber, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Patrick A. Bobek, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee/Respondent